1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11

VANCE HILDERMAN, an individual;
HIGHRELY INC., a Delaware
corporation,

CASE NO. 05cv1049 BTM(AJB)

12

**ORDER (1) GRANTING IN PART
AND DENYING IN PART ENEA'S
MOTION FOR SUMMARY
JUDGMENT (2) GRANTING IN
PART AND DENYING IN PART
COUNTERDEFENDANTS' FIRST
MOTION FOR PARTIAL SUMMARY
JUDGMENT; (3) DENYING
COUNTERDEFENDANTS' SECOND
MOTION FOR PARTIAL SUMMARY
JUDGMENT; AND (4) GRANTING
ENEA'S MOTION FOR SUMMARY
JUDGMENT ON THE SECOND AND
THIRD CLAIMS OF BAGHAI'S
COUNTERCLAIM**

13

Plaintiffs,

14

vs.

15
16
17

ENEA TEKSCI, INC., dba ENEA
embedded technology,

18

Defendants.

19
20

AND RELATED COUNTERCLAIMS

21
22
23
24
25
26
27
28

        Defendant Enea TekSci, Inc. ("Enea") has filed a motion for summary judgment on the

Complaint filed by Vance Hilderman ("Hilderman") and Highrely, Inc. ("Highrely") (collectively

"Plaintiffs").    Hilderman,  Highrely,  and  Tony  Baghai  ("Baghai")  (collectively

"Counterdefendants") have filed two motions for partial summary judgment on Enea's

counterclaims.  Enea has also filed a motion for summary judgment as to the Second and

Third Claims of Baghai's Counterclaim against Enea.  For the reasons discussed below,

Enea's motion for summary judgment as to Plaintiffs' claims is **GRANTED IN PART** and

1

**DENIED IN PART**, Counterdefendants' first motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART**, Counterdefendants' second motion for partial summary judgment is **DENIED**, and Enea's motion for summary judgment on the Second and Third Claims of Baghai's Counterclaim is **GRANTED**.

# I. FACTUAL BACKGROUND

This case arises out of a dispute between Enea and two of its former employees, Hilderman and Baghai.

Hilderman was the founder of TekSci, Inc., which was sold to Enea AB in 2000.  The company became known as "Enea-TekSci" or Enea.  Enea is a software consulting company that provides, among other things, software, systems development, consulting and training, and software certification for critical and real-time systems such as those systems found in the avionics industry, the telecommunications industry, and the medical industry.

Hilderman continued as an employee of Enea until he left the company in February 2004.  In February 2004, Hilderman and Enea entered into a Severance Agreement.  (Pls.' Ex. A.)  The Severance Agreement provided, among other things:

> 17. <u>Confidentiality</u>.  Employee agrees to keep confidential all trade secrets, confidential, and proprietary information of Enea obtained by Employee during the course of his employment with Enea, including, but not limited to, information pertaining to product offerings, pricing and marketing structures and strategies, software programs existing or under development, and the identities of current and prospective customers, to the extent such information is not generally available to the public.
>
> 18. <u>Anti-Piracy and Noncompetition</u>.  Employee shall not, for a period of six (6) months after the Resignation date, either on his own account or in conjunction with any other person, firm, or company;
>
> (a) Solicit or entice away, or attempt to solicit or entice away, from Enea or from its parent or any affiliated or subsidiary corporation, any person employed by Enea on the Resignation Date;
>
> (b) Solicit or attempt to solicit the business of any person, firm or company who has at any time within one year prior to the Resignation Date been a customer or client of Enea or its parent or any affiliated or subsidiary corporation.

The Severance Agreement provides that it shall be construed and interpreted

2

1    according to the laws of the State of California.  (Pls.' Ex. A at ¶ 12.)

2         In February 2005, Hilderman formed HighRely.  HighRely, like Enea, is engaged in

3    the business of providing engineering support and development to clients in need of

4    embedded high-reliability software services.

5         HighRely employed Ray Madjidi ("Madjidi"), a former project manager for Enea, and

6    Baghai, also a former employee of Enea.  Baghai and Madjidi ceased employment at Enea

7    in March 2005.  There is a dispute as to when Baghai and Madjidi began working for

8    HighRely.  Hilderman is a shareholder of HighRely, but is not an employee.

9         In late March, 2005, Boeing contacted Baghai regarding work on C-17 document

10   verification.  Baghai claims that he had been fired before being contacted by Boeing.  Enea

11   disputes Baghai's claim that he had been terminated.  In April, 2005 HighRely obtained a

12   contract with Boeing.

13        HighRely provided services on Boeing's C-130 program throughout 2005 and part of

14   2006.  Boeing ultimately terminated HighRely's contract, claiming that funding had ceased

15   for the C-130 program.  In March of 2005, Hilderman contacted Hospira, a medical device

16   company, to obtain a contract for HighRely.  No contract resulted from these discussions.

17        Hospira and Boeing were major customers of Enea during 2004 and 2005.  Hilderman

18   was involved in obtaining Hospira and Boeing as customers for Enea while he was employed

19   at Enea.  Baghai was involved in Boeing projects while he was employed at Enea.

20        Plaintiffs Hilderman and HighRely claim that Enea interfered with their contract with

21   Boeing and their prospective contract with Hospira by telling Boeing and Hospira that

22   Hilderman was violating the terms of the Severance Agreement and was subject to a non-

23   compete agreement.  Plaintiffs assert the following causes of action: (1) declaratory relief;

24   (2) breach of contract; (3) interference with contractual relations and prospective economic

25   advantage; and (4) violation of California Business & Professions Code § 17200.

26        In its Amended Counterclaim and Third-Party Complaint, Enea claims that Baghai,

27   while still employed by Enea, forwarded Enea's customer leads, proprietary trade secrets,

28   employee leads, Enea employee email addresses, and other confidential information to

3

Hilderman for the benefit of HighRely.  Enea asserts causes of action for (1) breach of the duty of loyalty by Baghai; (2) misappropriation of trade secrets by Baghai, Hilderman, and HighRely, (3) aiding and abetting by Hilderman; (4) breach of contract by Hilderman and Baghai; (5) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, by Hilderman, Baghai, and HighRely; (6) conspiracy to intentionally interfere with contract against Hilderman, Baghai, and HighRely; (7) conspiracy to intentionally interfere with prospective economic advantage against Hilderman, Baghai, and Highrely, and (8) unfair business practices, Cal. Bus. & Prof. Code § 17200, against Hilderman, Baghai, and HighRely.

In his Counterclaim, Baghai alleges that he was wrongfully terminated in breach of his employment agreement.  Baghai further alleges that company policy provided that he would have the right to purchase his laptop computer upon termination, but that Enea refused to allow him to do so.  According to Baghai, Enea accessed his private e-mail accounts and other information on the computer in violation of company policy.  The Counterclaim asserts causes of action for (1) breach of contract; (2) intrusion into private affairs; (3) violation of the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. §§ 2510-2522, 18 U.S.C. §§ 2701-2711); and (4) intentional infliction of emotional distress ("IIED").  In an order filed on June 13, 2006, the Court dismissed Baghai's claim under Title II of the ECPA (Baghai's claim under Title I survived) and IIED claim.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Freeman v. Arpaio</u>, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson</u>, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the

absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial.  Id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains.  Celotex, 477 U.S. at 314.  The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings."  Anderson, 477 U.S. at 256.  When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**III. DISCUSSION**

A.    Enea's Motion For Summary Judgment

Enea moves for summary judgment on all of the claims asserted by Hilderman and HighRely.  The Court will address each of the claims in turn.

1.  Declaratory Relief

Plaintiffs seek a declaration that pursuant to the Severance Agreement, Hilderman is entitled to solicit business, customers and employees of Enea after August 13, 2004.

The "actual controversy" requirement of the Declaratory Judgment Act is the same as the "case or controversy" requirement of Article III of the United States Constitution.  Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-40 (1937).  Article III requires that there be a "substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 272 (1941).   "[A]n actual controversy must be extant at all stages of review, not merely at the

1   time the complaint is filed." <u>Arizonans for Official English v. Arizona</u>, 520 U.S. 43, 67 (1997)

2   (internal quotation marks and citations omitted).

3       Enea does not dispute that under the terms of the Severance Agreement, Hilderman

4   is permitted to solicit employees and customers of Enea after August 13, 2004, *provided that*

5   Hilderman complies with the confidentiality provision of the Severance Agreement and does

6   not use confidential, proprietary or trade secret information of Enea.  The controversy

7   surrounds what constitutes confidential, proprietary or trade secret information that

8   Hilderman is prohibited from using and whether Hilderman/HighRely used any such

9   information in the pursuit of hiring employees or obtaining new business.

10      Plaintiffs' declaratory relief claim misframes the issue. There is no dispute that

11  Hilderman can solicit employees and customers of Enea after the initial six-month period as

12  long as no confidential, proprietary or trade secret information is used in the process.

13  Because there is no actual dispute within the claim for declaratory relief, the Court grants

14  summary judgment in favor of Enea, dismissing the claim without prejudice.

15      2.  <u>Breach of Contract</u>

16      Plaintiffs allege that Enea breached the terms and provisions of the Severance

17  Agreement by falsely telling third parties that Hilderman had agreed to a non-compete clause

18  and was breaching that agreement by soliciting former employees or customers of Enea.

19      Enea argues that there is no contract term which gives Hilderman the unfettered right

20  to solicit Enea's customers and employees after six months and that Hilderman was

21  obligated to respect Enea's confidential information.  However, there are triable issues as to

22  whether Hilderman used any confidential, proprietary or trade secret information to obtain

23  customers or employees.

24      It was an implied term of the contract that Hilderman could, after six months, solicit

25  Enea's customers and employees provided that there was no use of confidential, proprietary,

26  or trade secret information.  <u>See</u> Cal. Civil Code § 1656 ("All things that in law or usage are

27  considered as incidental to a contract, or as necessary to carry it into effect, are implied

28  therefrom . . . .")  If Enea told potential customers or employees not to deal with

6

Hilderman/HighRely because Hilderman was in breach of a non-compete agreement, it is arguable that Enea breached the implied covenant of good faith and fair dealing by attempting to deprive Hilderman of enjoying the benefits of the agreement – i.e., the right, under certain circumstances, to solicit employees and customers of Enea.  See Guz v. Bechtel National Inc., 24 Cal. 4th 317, 349 (2000) (explaining that the covenant of good faith and fair dealing, which is implied by law in every contract, prevents one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made.).

Enea argues that Hilderman has no proof that Enea told anyone that Hilderman was subject to a non-compete agreement and could not lawfully solicit employees or customers of Enea.  However, Hilderman and HighRely have raised a triable issue of material fact in this regard.  In his deposition, Hilderman explained that Neal Holland of Hospira told him that Hospira did not want to do business with him because individuals at Enea (Virginia Walker and Victoria Barrett) had told Holland that Hilderman had stolen things and was violating his noncompete agreement by even talking to Hospira.  (Hilderman Dep. (Pls.' Ex. L), 38:18-39:1.)  Hilderman also explained that individuals from Boeing management made direct statements regarding the potential for legal problems if Boeing hired HighRely.  (Hilderman Dep., 50:22-51:3.)

Enea contends that Hilderman has not suffered any damages personally from the alleged breach.  Hilderman contends otherwise but does not detail exactly what damages he is claiming.  This issue was not fully briefed, and it is unclear to the Court whether Hilderman can recover any damages.  Therefore, the Court denies Enea's motion as to this claim without prejudice.  The Court gives Enea leave to file a new motion for summary judgment limited to the issue of Hilderman's contract damages.  The moving and opposition papers shall be limited to 10 pages each, and the reply shall not exceed 5 pages.  If such a motion is brought, Hilderman's opposition must specify each and every element of his claimed damages.

Enea also challenges HighRely's standing to bring the breach of contract claim.  The

Court agrees that HighRely, who was not a party to the contract, lacks standing to assert this claim.  HighRely argues that it is a third-party beneficiary of the contract.  The Court is not persuaded by this argument.  "The circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement.  The contracting parties must have intended to confer a benefit on the third party."  Neverkovec v. Fredericks, 74 Cal. App. 4th 337, 348 (1999).  To determine whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves "construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered."  Jones v. Aetna Cas. & Surety Co., 26 Cal. App. 4th 1717, 1725 (1994).

Here, the Severance Agreement arose out of Hilderman's resignation from Enea and concerned the respective duties and rights of Hilderman, as a former employee and potential competitor, and Enea.  At the time the parties entered into the agreement, HighRely was not yet in existence, and no mention was made in the Severance Agreement regarding any companies or corporate entities that might be formed by Hilderman in the future.  Although any company formed by Hilderman would benefit from Hilderman being allowed to pursue Enea's employees and customers, there is no indication in the contract that the parties specifically intended to confer a benefit on such a separate entity.

Plaintiffs point to the following language in the Severance Agreement:

> The parties understand and expressly agree that this Agreement shall bind and *benefit* the heirs, parents, subsidiaries, partners, *successors*, employees, directors, stockholders, officers, attorneys, affiliates, predecessors, representatives and assigns of Employee and Enea.  Enea specifically represents that it has the authority to bind its parent corporation to this Agreement to the extent this Agreement creates obligations of the Parent.

(Severance Agreement, ¶ 11) (emphasis added).  Plaintiffs argue that HighRely is a "successor" who is entitled to enforce the benefits of the contract.  However, Plaintiffs do not cite any authority for deeming a corporation a "successor" to an individual party to a contract.  HighRely is not a "successor" under any ordinary meaning of the word.  See Black's Law Dictionary (8th ed. 2004) (defining successor as "one who replaces or follows a predecessor").

1    Accordingly, the Court denies Enea's motion for summary judgment as to Hilderman's

2    breach of contract claim but grants the motion as to HighRely's breach of contract claim.

3

4    3. Interference with Contract and Interference with Prospective Economic Advantage

5    Relying on Marin Tug & Barge, Inc. v. Westport Petroleum, Inc., 271 F.3d 821 (9th Cir.

6    2001), Enea argues that it cannot be sued for interference with contract or prospective

7    contract because it was not a "stranger" to Hospira and Boeing because it had preexisting

8    relationships with them.  Enea's reliance on Marin Tug is misplaced.  In Marin Tug, after

9    Marin Tug, an operator of barges, sued Shell Oil Products Company over the purchase of

10   contaminated fuel, Shell refused to contract with the barge operator and refused to allow its

11   oil to be carried on the operator's barges.  Marin Tug sued Shell for intentional interference

12   with prospective economic advantage.  The Ninth Circuit held that Marin Tug's claim failed

13   because Shell did not engage in any wrongful conduct.  The Ninth Circuit also noted that

14   Shell was not a stranger to the relationship between Marin Tug and the buyer of any Shell

15   oil shipped on Marin Tug's barges, because such relationships required direct, active

16   involvement by Shell - the loading of Shell oil onto Marin Tug's barges.  Id. at 834.  The Ninth

17   Circuit concluded that it was not wrongful for Shell to simply refuse to deal with Marin Tug

18   or to load its oil on Marin Tug's barges.

19   Here, even though Enea had its own relationships with Hospira and Boeing, it did not

20   have any involvement in the relationship between HighRely and the companies.  Enea was

21   an outsider to HighRely's contractual relationships with the companies and can be held liable

22   for intentionally interfering with the contracts/prospective contracts.  See Applied Equipment

23   Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 513-14 (1994).

24   Enea argues that there is no evidence that HighRely lost any existing contracts as a

25   result of Enea's alleged conduct.  According to Robert Allard of Boeing, HighRely's work for

26   Boeing came to an end about December 2005 because funding had run out at that time.

27   (Allard Dep. (Enea's Ex. E), 78:2-9.)  In a declaration, Hilderman states that he is personally

28   aware of the C-130 program and the fact that it has continued through this date.  (Hilderman

Decl. ¶ 10.)  Hilderman claims that much of the C-130 work has been given to Enea "who has earned literally millions of dollars in the continuation of this work all at the expense of HighRely."  (Id.)  However, Hilderman fails to establish the basis for his alleged knowledge that the C-130 program never ran out of funds and continued to the present.  Hilderman has not made any showing that he has personal knowledge of these facts.  Therefore, Enea is entitled to summary judgment on the interference with contract claim.

With respect to the interference with prospective economic advantage claim, Enea argues that there is no evidence that it wrongfully caused HighRely to lose potential business.  The elements of an interference with prospective economic advantage ("IPEA") claim are:  (1) an economic relationship between the plaintiff and a third party that carries a probability of future economic benefit to the plaintiff; (2) defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the defendant's acts.  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1153-54, 1164-65 (2003).  Furthermore, the plaintiff must allege that the defendant's act was "wrongful 'by some measure beyond the fact of the interference itself.'" Della Penna v. Toyota Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 392-93 (1995) (quoting Top Serv. Body Shop, Inc. v. Allstate Ins. Co., 283 Or. 201, 582 P.2d 1365, 1371 (1978)).

Enea argues that Hilderman/HighRely did not have an existing economic relationship with Hospira.  However, according to Hilderman, in or about March of 2005, he contacted Hospira to obtain a contract for HighRely.  (Hilderman Decl. ¶ 12.)  Hospira indicated that they had a need for further engineering talent and indicated that they would enter into an agreement for HighRely's engineering services.  (Id.)  However, Hospira later informed Hilderman that it did not want to enter into a contract with HighRely because Enea claimed that Hilderman was in violation of a non-compete agreement.  (Id.)  This evidence raises a triable issue with respect to the existence of an economic relationship carrying a probability of future economic benefit to HighRely.

Enea also argues that HighRely fails to satisfy the requirement of an independent

wrong.  An act is independently wrongful "if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." Korea Supply, 29 Cal. 4th at 1159.  It is arguable that Enea's actions were independently wrongful because they breached the covenant of good faith and fair dealing  that was implied in the Severance Agreement with Hilderman.[1]  Furthermore, as discussed below, Plaintiffs' section 17200 claim survives summary judgment.  A violation of section 17200 can satisfy the requirement of an independently wrongful act.  CRST Van Expedited, Inc. v. Werner Enter., Inc., 479 F.3d 1099, 1110 (9th Cir. 2007).

However, the IPEA claim belongs to HighRely only.  The Court agrees with Enea that Hilderman lacks standing to pursue the IPEA claim, which is based on a potential contract between HighRely and Hospira.  See Sutter v. General Petroleum Corp., 28 Cal. 2d 525, 530 (1946) (explaining that as a general matter, a stockholder may not maintain an action in his own behalf for a wrong done by a third person to the corporation on the theory that such wrong devalued his stock).

Furthermore, HighRely has failed to raise a triable issue as to Enea's alleged interference with prospective contracts  with Boeing.  As discussed above, Hilderman has not shown that he has personal knowledge regarding the continuation of the C-130 program. Therefore, there is no evidence from which to infer that Boeing ceased doing business with HighRely as a result of Enea's actions and that HighRely lost contracts that it would otherwise have been awarded.

In sum, the Court grants Enea's motion for summary judgment as to Hilderman's and HighRely's intentional interference with contract claim, Hilderman's IPEA claim, and HighRely's IPEA claim to the extent it is based on the loss of prospective contracts with Boeing.  The Court denies' Enea's motion as to HighRely's IPEA claim with respect to the

---

[1]  Although cases have held that a defendant's breach of a contract with the plaintiff "cannot be transmuted into tort liability by claiming that the breach detrimentally affected the [plaintiff's] business," JRS Products, Inc. v. Matsushita Electric Corp. of America, 115 Cal. App. 4th 168, 180-83 (2004), the Court did not locate any cases dealing with situations where the independent wrong is a breach of a contract between the defendant and a third-party. As discussed infra, the IPEA claim belongs to HighRely.

1    loss of a prospective contract with Hospira.

2

3         4.  Section 17200 Claim

4         Enea argues that summary judgment should be granted on Plaintiffs' section 17200

5    claim because there is no evidence that Enea is falsely claiming to businesses and

6    customers that Hilderman is the subject of a covenant not to compete.   However, as

7    discussed above, Hilderman claims that Neal Holland of Hospira told him that Virginia Walker

8    and Victoria Barrett stated that Hilderman had stolen things and was violating the non-

9    compete agreement by talking to Hospira.  (Hilderman Dep. 38:18-25.)  Therefore, Enea's

10   motion for summary judgment is denied on this claim.[2]

11

12   B.  Counterdefendants' Motions for Partial Summary Judgment

13        In their first motion, Counterdefendants move for summary judgment on Enea's

14   misappropriation of trade secret claim to the extent it is based on (1) the alleged

15   misappropriation of DO-178B checklists and processes; and (2) the alleged misappropriation

16   of trade secrets in connection with entering into a contract with Boeing.  For the reasons

17   discussed below, the Court grants Counterdefendants' motion with respect to the DO-178B

18   checklists and processes and denies the motion with respect to the Boeing contract.

19        In their second motion, Counterdefendants seek summary judgment that (1) there is

20   no trade secret with respect to Enea's customers, customer contact information, and

21   customer pricing; (2) Enea's employees were not trade secrets and were not wrongfully

22   solicited by Counterdefendants; and (3) Baghai's operative employment agreement with

23   Enea did not contain a non-solicitation provision.  The Court denies this motion.

24

25

26        [2]  In their opposition, Hilderman and HighRely argue that Enea also violated section
     17200 by (1) attempting to enforce an unenforceable non-compete clause in a 2003
27   employment contract with Baghai; and (2) using photographs of Baghai and Madjidi in an
     Enea product catalog without obtaining their permission.  These claims exceed the scope of
28   the complaint, which alleges only that Enea violated section 17200 by falsely claiming that
     Hilderman was the subject of a covenant not to compete.

05cv1049BTM(AJB)

1    1. <u>DO-178 B Checklists & Processes</u>

2    The FAA requires that all avionics software meet testing and certification standards

3    set forth in DO-178B, a published regulation.  (Hilderman Decl. ¶ 8.)  In the late 1990's

4    Hilderman and Baghai wrote TekSci's DO-178B processes and checklists.  Enea claims that

5    these DO-178B processes and checklists are trade secrets that were misappropriated by

6    Counterdefendants.

7    California's Uniform Trade Secrets Act defines a trade secret as follows:

8    "Trade secret" means information, including a formula, pattern, compilation,
     program, device, method, technique, or process, that:

9
10   (1) Derives independent economic value, actual or potential, from not
     being generally known to the public or to other persons who can obtain
     economic value from its disclosure or use; and

11
12   (2) Is the subject of efforts that are reasonable under the circumstances
     to maintain its secrecy.

13   Cal. Civ. Code § 3426.1(d).

14   Counterdefendants contend that Enea's DO-178B processes and checklists were

15   based on a variety of public domain sources and do not contain any unique information that

16   derives economic value from being kept secret.  Hilderman and Baghai explain that the

17   processes and checklists were prepared from public domain sources including the regulation

18   itself and checklists prepared by Boeing ("D6 checklists").  (Hilderman Decl. ¶¶ 11, 13;

19   Baghai Decl. ¶ 9.)  The "vast majority" of the information reflected in Enea's DO-178B

20   processes and checklists was taken from the D6 checklists, which were publicly available.

21   (Hilderman Decl. ¶ 13.)

22   Enea does not explain how its DO-178B processes and checklists are different from

23   or an improvement upon the information that is publicly available.  Connie Beane of Enea

24   states that Boeing's D6 checklists consist of a total of 22 checklists, whereas Enea has 133

25   checklists.  (Beane Decl. ¶ 13.)   However, Enea still fails to present any evidence that its

26   checklists set forth information that is not generally known within the industry.  Victoria

27   Barrett, the individual designated by Enea under Fed. R. Civ. P. 30(b)(6) to testify regarding

28   the trade secret claims, could not explain what sets Enea's checklists apart from other

13

1    publicly available checklists other than that she heard Enea's checklists "track" DO-178B

2    better.  (Barrett Dep. (HighRely Ex. G), 125:15-126:25.)

3          Enea argues that Counterdefendants are estopped from arguing that the DO-178B

4    processes and checklists are trade secrets.  Enea's estoppel argument fails for several

5    reasons.  First and foremost,  the doctrine of estoppel requires, among other things, that the

6    party invoking the doctrine have relied upon the statement or conduct at issue to his injury.

7    DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Café and Takeout III, Ltd., 30 Cal. App. 4th 54,

8    59 (1995); Cal. Evid. Code § 623.  Even if Counterdefendants made prior representations

9    that the DO-178B processes and checklists were trade secrets, Enea has not shown how it

10   relied upon these representations to its detriment.  No trade secrets were valued in the sale

11   of TekSci to Enea.  (Hubbard Decl. ¶ 4.)  TekSci's valuation was based strictly on its earnings

12   and a multiplier of the earnings.  (Hubbard Decl. ¶ 3.)

13         Moreover, the prior statements upon which Enea relies are, for the most part, vague

14   puffery or references to "proprietary" information, which is not the same thing as trade

15   secrets.  For example, Hilderman's statement that TekSci "invested over one million dollars

16   in our technical and management processes and they are very unique" does not detail what

17   is unique about the processes, which, at any rate, presumably include more than the DO-

18   178B processes and checklists.  (Enea Ex. 6.)  Marketing materials and other documents

19   authored by Hilderman and/or Baghai refer to the DO-178B processes and checklists as

20   "proprietary."  (Enea Exs. 5, 9, 14, 15, 18, 20, 32, 56.)  However, the processes and

21   checklists were apparently copyrighted.  A proprietary interest in a copyright or other

22   intellectual property does not necessarily constitute a trade secret. See Buffets, Inc. v. Klinke,

23   73 F.3d 965, 968 (9th Cir. 1996) (explaining the difference between copyright, which protects

24   a particular expression of an idea, and trade secret law, which protects an author's very

25   ideas).

26         Enea also attempts to invoke the doctrine of judicial estoppel, arguing that Hilderman

27   took a contrary position in a copyright infringement/misappropriation of trade secret action

28   brought against Enea by ELDEC.  In response, Hilderman has submitted documents filed in

14

1   that action, which show that TekSci/Hilderman actually defended the suit by arguing that the

2   structural coverage document at issue was based upon publicly available information and

3   was *not* a trade secret.  (HighRely Exs. D, E.)  Based on the documents before the Court,

4   Hilderman did not take an inconsistent position during the ELDEC litigation and is not

5   judicially estopped.

6        Enea has failed to raise a triable issue of material fact with respect to whether its DO-

7   178B checklists and processes derive independent economic value from not being generally

8   known to the avionics industry.  Therefore, the Court grants summary judgment on Enea's

9   trade secret claim to the extent it is based on the DO-178B checklists and processes.  The

10  Court does not reach the issues of whether Enea took reasonable efforts to maintain the

11  secrecy of the DO-178B checklists and processes or whether HighRely uses or has used the

12  checklists and process.[3]

13

14       2.  Boeing Contract

15       Enea contends that Counterdefendants stole the Boeing account and misappropriated

16  trade secrets in the process.  Although Enea concedes that the identity of Boeing was not

17  a trade secret, Enea contends that the contact information regarding Robert Allard at Boeing

18  was a trade secret.  In addition, Enea argues that a jury could find that HighRely used Enea's

19  pricing information to bid on the Boeing project at a lower price and take the business from

20  Enea.

21       Enea has not established that the contact information of Robert Allard was a trade

22  secret.  According to Baghai, he was introduced to Allard in or about 1996, while he was at

23  TekSci, and has had a long-standing professional relationship with him.  (Baghai Decl. in

24  _____

25       [3]  In its opposition papers, Enea claims that Counterdefendants have hidden and
     destroyed evidence.  Enea requests that the Court issue an order that Counterdefendants'
26   destruction of evidence and failure to produce is a violation of the law.  Enea also requests
     that the Court instruct the jury that they can infer that Counterdefendants stole trade secrets,
27   profited from them, and have concealed the conduct.   If Enea believed that
     Counterdefendants engaged in discovery abuse, Enea should have raised the issue before
28   the Magistrate Judge.  Counterdefendants' conduct during discovery is not properly before
     the Court at this time.

Support of Reply ¶ 3.)  Baghai also explains that Boeing frequently directs outside suppliers to Allard and provides them with his contact information.  Enea has not provided any evidence to the contrary.  Therefore, there is no basis for finding that Allard's contact information was a trade secret.  See Advantacare Health Partners, L.P. v. Access IV, Inc., 2003 WL 23883596 (N.D. Cal. Oct. 24, 2003) (explaining that referral sources solicited by Defendants were known in the industry  - "Any newcomer to the industry would be able to discover the identities of these sources and to solicit them.").

However, there is a triable issue of material fact with respect to Enea's pricing information.  Counterdefendants argue that Enea's pricing was not a trade secret because Enea priced its engineers at hourly rates that reflect market rates known to the industry. (Baghai Decl. ¶ 5; Walonoski Dep. (Enea Ex. B in Support of Reply), 70:18-71:8.)  Although Enea's prices may have generally reflected market rates, Enea has presented evidence that Enea uses different price lists for different customers.  (Elliot Decl. in support of Enea's opp. to second motion ("Elliot Decl. 2"), ¶ 17; Elliot Dep. (Enea's Ex. 53 in opp. to second motion), 81:14-82:12.)  Hilderman, while at Enea, devised a method whereby different rate sheets were linked to different suite numbers in the Enea address.  (Id.) Only Enea knew the rate differences.  (Elliot Decl. 2, ¶ 17.)  This specific information regarding pricing differences among Enea's various customers arguably would derive independent economic value from not being generally known to the public.  Thus, the Court denies summary judgment on this issue.[4]

To the extent Enea claims that the information regarding Boeing's C-17 project was a trade secret, there is no evidence that Counterdefendants misappropriated it.  Allard thought Baghai was still at Enea when he called him in March, 2005.  (Allard Depo. (Enea Ex. 43-162 in opp. to second motion) 94:16-18.).  However, Allard's primary purpose was to

---

[4]  The Court does not have enough information to determine whether Enea made reasonable efforts to keep the different rates secret.  Enea admittedly provided rate sheets to some prospective and existing customers.  (Elliot Depo. (Ex. 53), 82:4-9.)  What steps Enea took to preserve the alleged secrecy of this information vis-à-vis prospective and existing customers, in addition to Enea employees, is a matter that should be addressed at trial.

05cv1049BTM(AJB)

talk to Baghai in particular.  The critical design review for the C17 project had already failed twice, and the Air Force specifically recommended Baghai and Hilderman.  (Allard Depo. (HighRely Ex. H), 47:2-4.)  Whether Baghai was fired or resigned, there is no indication that Allard's interest in talking to Baghai about the project depended on Baghai being employed at Enea.  Moreover, it appears that Allard was going to contact Hilderman/HighRely anyway. Therefore, there was no misappropriation of trade secret information regarding the C-17 project.  Whether Baghai breached his duty of loyalty or any contractual provisions in the course of pursuing the Boeing project for HighRely is a separate matter that does not bear upon the trade secret claim.

### 3. Enea's Customer Information

Counterdefendants claim that there is nothing secret about Enea's customers. According to Counterdefendants, these avionics customers are readily ascertainable.  Enea counters that the identity of its customers and projects is not published or known generally and that Enea has spent money developing the customer list through its marketing programs. (Elliot Decl. 2 ¶¶ 8-9.)

Client lists can receive trade secret protection if they satisfy the requirements of Cal. Civ. Code § 3426.1(d).  Reeves v. Hanlon, 33 Cal. 4th 1140, 1155 (2004).  As explained in Morlife, Inc. v. Perry, 56 Cal. App. 4th 1514, 1521-22 (1997), where the employer has "expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market. . . . [A] customer list can be found to have economic value because its disclosure would allow a competitor to direct its sales efforts to those customers who have already shown a willingness to use a unique type of service or product as opposed to a list of people who only might be interested."  See also MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 521 (9th Cir. 1993) (holding that a customer database had potential economic value because it allowed competitors to direct its sales efforts to those potential customers that are already using the MAI computer system.)

17

Although Enea's clients may be businesses that are well-known in the avionics industry, it is unclear whether it is generally known that these particular business use the services provided by Enea.  If all or almost all businesses in the avionics industry use these types of services or if the number of businesses in the avionics industry is very small then the identity of Enea's avionics clients may not qualify as a trade secret.  However, Counterdefendants have not presented evidence in this regard.  Therefore, there is a triable issue as to whether Enea's client list derives economic value from not being generally known to the public.

Counterdefendants argue that Enea did not make reasonable efforts to keep its client list secret because it only had confidentiality agreements with select customers and employees.  Even if this is true, the lack of confidentiality agreements is not dispositive on the issue of secrecy.  Enea may have taken other precautions to keep its information secret, such as verbally telling its clients and employees that the information was confidential or limiting access to information on a "need to know" basis.  See, e.g., Religious Technology Center v. Net-Com On-Line Communication Services, Inc., 923 F. Supp. 1231, 1253 (N.D. Cal. 1995).  Enea claims that it takes steps to keep the information secret (Elliot Decl. 2, ¶ 9) but does not describe exactly what steps it takes.  Accordingly, the Court does not have sufficient information to determine whether Enea took reasonable steps to keep the client list secret and will allow the claim to proceed to trial.

As for Enea's pricing information, as discussed above, there is a triable issue with respect to whether the different rate sheets used by Enea qualify as a trade secret.  Thus, Counterdefendants' motion for summary judgment is denied with respect to Enea's pricing and customer information.

4. Enea's Employees and Engineers

Counterdefendants argue that there is no evidence of any use of trade secrets in connection with the solicitation of Enea's engineers.  Counterdefendants point out that the majority of the employees hired by HighRely were independent contractors and did not work

at Enea at the time they joined HighRely.  Even if this is so, there is still a triable issue regarding the misappropriation of trade secrets in connection with the solicitation for Enea's engineers.

According to Enea, engineers are recruited by paid recruiters.  (Elliot Decl. 2, ¶ 8.) The employee and engineer list was on a server at Enea protected by a password.  (Elliot Decl. 2, ¶ 9.)  The engineer list had limited access.  (Id.)  Baghai had access to the engineer contact list.  (Id.)  On March 16, 2005, Baghai forwarded to Hilderman an e-mail contact list for Enea's employees and contractors.  That same day, Hilderman sent an e-mail to Enea's employees and engineers, urging them to think about various issues before signing a confidentiality agreement with Enea.  (Enea's Ex. 30 in opp. to second motion.)  In addition to discussing the validity/invalidity of non-compete agreements, the e-mail discussed the formation of HighRely:

> Yes, I am starting a new company.  There has never been any secret to that. Please note that we fully intend to hire the best engineers and personnel available, subject to their availability, interest, and presenting a strong win/win situation.  In other words, the same recipe for success we employed 15 years ago when we created what became the largest and best real-time consulting company in the West.  Our new company has far greater plans than that however, and those will be announced via the grand opening of our new headquarters building in Phoenix; recently purchased and being completed now our operations will begin in May 2005 and key employees are already coming on-board; financing and partnerships are completed also.

The e-mail also explained, "Your non-compete does not restrict you from speaking to me about job opportunities, whether you call me or I call you."  It appears that Ali Motamedi, Brad Dubois, and Jimmy Terry, all of whom subsequently joined HighRely, received this e-mail. (Enea's Ex. 21 in opp. to second motion.)  This evidence raises a triable issue as to whether Counterdefendants used trade secret information to solicit employees for HighRely.  Whether Enea can prove damages resulting from the misappropriation of the employee/contractor contact list is a separate issue to be resolved at trial.

The Court rejects Counterdefendants' argument that because, under the Severance Agreement, Hilderman was allowed to solicit Enea's employees after 6 months, any trade secret protection with respect to employee information was waived.  It seems that it would be possible for Hilderman to solicit employees without misappropriating trade secrets – e.g.,

Hilderman could contact employees or contractors he knew while he was at Enea by independently obtaining telephone numbers or e-mail addresses.

### 5. Baghai's Employment Agreement

Baghai contends that his 2003 employment agreement (Enea Ex. 3 in opp. to second motion), which contains a non-solicitation provision, was superceded by a July 28, 2004 employment agreement (HighRely's Ex. E-2 in support of second motion), which does not contain a non-solicitation clause.  Enea disputes the validity of the unsigned July 28, 2004 employment agreement.

The Court declines to rule on this issue at this time.  What employment agreement is the operative one does not dispose of any discrete portion of Enea's trade secret claim, nor does it eliminate Enea's breach of contract claim due to the fact that the 2004 agreement includes a confidentiality provision.

## C. Enea's Motion on Baghai's Second and Third Claims

Enea moves for summary judgment on Baghai's second cause of action for invasion of privacy and third cause of action for violation of the Stored Communications Act, 18 U.S.C. § 2701(a)(1).  The Court grants Enea's motion on both causes of action.

### 1. Invasion of Privacy

The laptop computer at issue was purchased for Baghai's use by Enea.  (Elliot Decl. ¶¶ 10-11.)  There is a dispute as to whether Enea had a policy in place which allowed employees to purchase their laptops upon leaving the company.  Baghai claims that in reliance on the policy, he used the laptop for personal purposes such as on-line banking and calendaring. (Baghai Decl. ¶ 3.) Baghai maintained a personal e-mail account at AT&T.com, which was used for personal and private e-mails.  (Id. at ¶ 5.)  He accessed the e-mail account from his laptop, and his personal log-in and password were stored on the computer. (Id.)  Baghai saved some of his e-mails on his computer's hard drive.  (Id. at ¶ 6.)  When

Baghai left Enea, he attempted to exercise the option to purchase the laptop but was refused.  (Id. at ¶ 4.)  Baghai told Enea that he did not consent to them accessing any of the information on the computer.  (Id.)

Enea denies that the policy allowing employees to purchase company laptop computers was still in effect.  Enea explains that after it discovered Hilderman's mass e-mail to Enea employees regarding the confidentiality agreement, Enea inspected the laptop to determine whether Baghai was providing confidential information to Hilderman.  (Elliot Decl. ¶ 12.)  Charles Elliot, Controller of Enea, explains that to his knowledge, he is the only Enea employee who accessed the computer.  (Id. at ¶ 14.)  Elliot states that he did not look for or find any intimate information, pictures, or data of Baghai's on the laptop.  (Id. at ¶ 15.)  He also states that Enea has not accessed Baghai's AT&T e-mail account, although it has accessed e-mails saved to the computer.  (Id. at ¶ 17.)

Under Arizona and California law, the elements for invasion of privacy are: (1) an intentional intrusion into a private place, conversation, or matter (2) in a manner highly offensive to a reasonable person.  Shulman v. Group W Productions, Inc., 18 Cal. 4th 200, 231 (1998); Medical Lab. Mgmt. Consultants v. American Broadcasting Companies, Inc., 306 F.3d 806, 812 (9th Cir. 2002).  To prevail on the first element, the plaintiff must show that he had a reasonable expectation of seclusion or solitude in the place, conversation, or data source.  Medical Lab., 306 F.3d 812-13.  In determining whether an alleged intrusion is "highly offensive" for purposes of the second element, relevant considerations include "the degree of the intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded."  Id. at 819 (quoting Deteresa v. Am. Broad. Cos., 121 F.3d 460, 465 (9th Cir. 1997)).

There is a triable issue as to whether Baghai has satisfied the first element.  Although Elliot denies finding any intimate information, it seems that in the process of searching for pertinent information, Elliot would have inevitably stumbled upon some of the personal information stored on the computer.  Whether Baghai had a reasonable expectation of

privacy in the personal data saved on the computer depends on whether Enea still had a policy of allowing employees to purchase their laptops.  There is a genuine issue of material fact in this regard.

However, the Court finds as a matter of law that Enea's purported intrusion into Baghai's personal matters was not "highly offensive."  Although Baghai might have believed that he could purchase the computer upon leaving the company, the computer was, until that time, Enea's property.  Enea did not look at the computer for the purpose of rooting out personal information about Baghai, but, rather, was motivated by a desire to protect its confidential information and to ensure that Baghai was not engaged in unauthorized activity that would harm Enea.  Although Elliot may have come across some personal information while searching the computer, there is no evidence that Elliot used the laptop to access Baghai's AT&T e-mail account or otherwise pry into Baghai's personal affairs.  In addition, the intrusion was limited to Elliot himself and perhaps a forensic computer specialist.  (Elliot states that the laptop was sent to a forensic computer specialist for "safe keeping."  (Elliot Decl. ¶ 14.)  The laptop was not passed around the company, but, rather, was kept in Elliot's locked office until it was sent to the forensic computer specialist.  (Id.)

The facts of this case are distinguishable from cases where a defendant hacks into someone's home computer for purposes of finding out personal information.  Considering all of the circumstances, the Court concludes that the alleged invasion of privacy was not "highly offensive."  Therefore, the Court grants summary judgment in favor of Enea on this cause of action.

### 2. Stored Communications Act

Previously, the Court denied Enea's motion to dismiss Baghai's claim that Enea violated 18 U.S.C. § 2701(a)(1) because Baghai alleged that Enea accessed his e-mail communications which were stored on his e-mail provider's server.

Baghai has not presented any evidence that Enea accessed his e-mail account and read e-mails stored on the AT&T server.  Although Enea accessed e-mail messages stored

on the *laptop computer*, these actions do not violate section 2701(a)(1).

Section 2701(a) provides:

Offense. – Except as provided in subsection (c) of this section whoever –
(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or
(2) intentionally exceeds an authorization to access that facility;
and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage in such system shall be punished as provided in subsection (b) of this section.

It is questionable whether the laptop computer qualifies as a "facility through which an electronic communication service is provided."' See Theofel v. Farey-Jones, 359 F.3d 1066, 1077 n. 4 (9th Cir. 2004) (noting Defendants' argument that Plaintiffs' computers are not "facilities" covered by section 2701(a)(1)).  However, even setting this issue aside, the e-mail messages stored on the hard drive do not constitute "electronic storage" within the meaning of the Stored Communications Act.  The Act defines "electronic storage" as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication."  18 U.S.C. § 2510(17).  Because subsection (A) applies only to messages in "temporary, intermediate storage," courts have construed subsection (A) as applying to e-mail messages stored on an ISP's server pending delivery to the recipient, but not e-mail messages remaining on an ISP's server after delivery.  See Theofel, 359 F.3d at 1075.  E-mails stored on the laptop computer are not in "temporary, intermediate storage."  Furthermore, the e-mails on the laptop are not stored "by an electronic communication service for purposes of backup protection" as required by subsection (B).

The e-mails stored on the computer are not in "electronic storage" as defined by the Stored Communications Act.  Therefore, Enea is entitled to summary judgment on this claim.

## IV.  **CONCLUSION**

For the reasons discussed above, Enea's motion for summary judgment on Plaintiff's Complaint [71] is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** as

to Plaintiffs' declaratory relief claim, HighRely's breach of contract claim, Plaintiffs' intentional interference with contract claim, Hilderman's IPEA claim, and HighRely's IPEA claim to the extent it is based on the loss of prospective contracts with Boeing.  The motion is **DENIED** as to the remaining claims.

Counterdefendants' first motion for partial summary judgment [70] is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** to the extent Enea's misappropriation of trade secret claim is based on Enea's DO-178B processes and checklists.  The motion is **DENIED** with respect to Enea's claim that Counterdefendants misappropriated trade secrets, specifically pricing information, in connection with their efforts to obtain the Boeing contract.  Plaintiffs have made evidentiary objections to Defendant's submissions. The Court finds these objections to be moot because the result ordered herein would be the same even if all of the objections were sustained.  Therefore, it is unnecessary to rule on the objections, and they are overruled as moot.

Counterdefendants' second motion for partial summary judgment [79] is **DENIED**.

Enea's motion for summary judgment on Baghai's Second and Third Claims [78] is **GRANTED**.

**IT IS SO ORDERED.**


DATED:  March 12, 2008

Honorable Barry Ted Moskowitz
United States District Judge

05cv1049BTM(AJB)